```
            IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          BECKLEY
```

**UNITED STATES OF AMERICA**

v.                                    CRIMINAL NO. 5:20-CR-00145-01

**JULIE M. WHEELER**

## UNITED STATES RESPONSE TO DEFENDANT'S OBJECTIONS AND RESTITUTION

The United States of America, by Erik S. Goes, Assistant United States Attorney for the Southern District of West Virginia, offers the following response to Defendant's objections to the application of certain guideline enhancements and the inclusion of restitution in anticipation of Defendant's sentencing, presently scheduled for some time after January 11, 2021.

### THE PLEA AGREEMENT

On October 7, 2020, the United States and Defendant entered into a written Plea Agreement. ECF 41. In the Plea Agreement, the parties arrived at an agreement on the sentencing guidelines. *Id.* Paragraph ("¶") 10. The parties agreed that the base offense level is that of 14. *Id.; See* USSG §2J1.2. There is a two-level enhancement for using a minor to commit a crime. *Id.; See* USSG §3B1.4. The parties agreed the adjusted offense level is that of 16. ECF. 41, ¶ 10.

This Plea Agreement is contractually binding and, as such, necessarily restricts the positions the United States may take in this response or at sentencing. "Plea agreements are grounded in contract law, and as with any contract, each party is entitled to receive the benefit of his bargain." *United States v. Edgell*, 914 F.3d 281, 287 (4th Cir. 2019) (internal quotations omitted). "When a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." *Santobello v. New York*, 404 U.S. 257, 262 (1971). A government breach of such a promise violates due process. *See United States v. Martin*, 25 F.3d 217, 217 (4th Cir. 1994). "The government is only bound, however, by the promises that were actually made in inducing a guilty plea. *United States v. Lewis,* 633 F.3d 262, 269 (4th Cir. 2011).

All of the parties acknowledged in the plea itself that "the Court and the Probation Office are not bound by the parties' calculation of the United States Sentencing Guidelines" and the parties "shall not have a right to withdraw from the plea due to a disagreement with the Court's calculation of the appropriate guideline range." ECF. 41, ¶ 10.

## THE REVISED PRESENTENCE INVESTIGATION REPORT

The Revised Presentence Investigation Report ("PSR") includes an additional three-level enhancement that the parties did not agree to or bargain for, that is, that Defendant's conduct resulted in the "substantial interference with the administration of justice." PSR, ¶ 48. Defendant has objected to its inclusion in her supplement to her sentencing memorandum. ECF 63.

## ANALYSIS

The United States will honor, as it must, the Plea Agreement and will not seek the inclusion of the three-level enhancement. Further elaboration on this position will be included under the Plea Agreement section for Final Disposition, where the United States is permitted to respond to questions raised by the Court and correct inaccuracies in the presentence report to present its position as to why this three-level enhancement is properly excluded. ECF 41, ¶ 13(c)and (d).

At the time the plea was entered, the United States agreed that Defendant's conduct did not result in the "substantial interference with the administration of justice" as defined in USSG §2J1.2(b)(2).[1] This agreement was based upon the plain

---

[1] The following analysis must not be interpreted as justifying Defendant's criminal conduct. Nor should this presentation be taken to minimize the Court's Probation Department work in the instant case, who did their usual exemplary work in thoroughly developing the PSR. Rather, this argument focuses on the narrow interpretation of the enhancement and whether it should apply in this instance.

3

language of the enhancement--justice was administered to the defendant in her healthcare fraud case (Docket No: 2:19-00235) in a swift and timely fashion because her scheme did not actually substantially interfere with the administration of justice. Her corrupt scheme concerning her disappearance and plan to go into hiding was undone in less than three days. Her capture and subsequent prosecution did not interfere with her criminal conduct relating to the healthcare fraud or the Court's imposition of sentence.[2]

The commentary and the application notes further define the application of this enhancement. "Substantial interference with the administration of justice includes a premature or improper termination of a felony investigation, an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false event, or the unnecessary expenditure of substantial governmental or court resources." See USSG §2J1.2, comment. (n.1). Wheeler's healthcare fraud case was not terminated, the sentencing delay was minimal,[3] there were no instances of perjury or false

---

[2] Wheeler's sentence for the healthcare fraud was further enhanced by the Court two levels for obstruction in the timely sentencing hearing, so it resulted in a worse sentence for the healthcare fraud independently of this separate criminal charge. She also lost all three points for acceptance of responsibility. In total, she received 42 months of incarceration, three years of supervised release and was ordered to pay $289,055.07 in restitution to the Veterans Health Administration Office of Community Care. (Case No. 2:19-00235, ECF 61).

[3] In the healthcare fraud matter, this Court briefly continued sentencing to allow the parties to respond to the revised

4

testimony, and there were no known expenses to the Court or the Court's Probation Office.

The only plausible argument for the inclusion of this enhancement is the PSR's claim that the "unnecessary expenditure of substantial governmental resources" includes the investigative costs of the search and criminal investigation, and these costs resulted in the "substantial interference" to the administration of justice.[4]  PSR ¶ 33; USSG §2J1.2, comment. (n.1).  The PSR reports the costs of the investigation were $27,253.94 to quantify the "time and resources" used to locate defendant.  *Id.*  This sum was provided by the National Park Service.

There is tension with this enhancement and what is normally excluded from "loss"—the costs to the government as a victim and costs incurred by victims primarily to aid the government in the prosecution and criminal investigation of the offense.  *See* USSG §2B1.1, comment. (n.E) (Credits against Loss).  This three-level enhancement uses the widest possible definition of "substantial government resources" to include every person who searched for

---

presentence report that removed Wheeler's acceptance of responsibility and imposed a two-level obstruction of justice enhancement.

[4] The United States acknowledges that the Application Note's use of the word "resources" may be broader and capture more conduct than the investigative "costs" that are normally excluded from a "loss" calculation.  Though use of "resources" would normally be quantified through monetary cost, it could perhaps also include the calculation of time or use of materials.  In this instance, the National Park Service used time and use of materials of all persons and agencies to quantify costs to the government.

5

Defendant (such as volunteers) as contributing to the "substantial government resources" expended.  This $27,253 sum mostly includes an assumed cost estimate for the value of the time spent that was **not actually paid** by the National Park Service.  *See infra* (emphasis added).  Finally, this estimate relies upon the National Park Service calculation to itself to determine what is a "substantial government expense."

Case law would support this Court's exclusion of the enhancement consistent with the Plea Agreement.  Defendant has cited to multiple cases in support of her argument that the three-level enhancement should not be applied because investigative costs typically cannot be recovered through restitution to the government employees. ECF 63, *citing to United States v. Johnson*, 485 F.3d 1264, 1271-72 (11th Cir. 2007); *United States v. Norris*, 217 F.3d 262, 275 (5th Cir. 2000); *United States v. Tackett*, 193 F.3d 880, 886-87 (6th Cir. 1999); *United States v. Sinclair*, 109 F.3d 1527, 1539-40 (10th Cir. 1997), *United States v. Jones*, 900 F.2d 512 (2d Cir. 1990).

Cases where the enhancement was applied are distinguishable from the facts of the instant case.  In *United States v. Leung,* 360 F.3d 62 (2d Cir. 2004), Defendant Leung faked his death to "jump" federal bail by falsely reporting to his attorney that he

died in the 911 terrorist attacks.[5]  *Id.* at 65.  In finding the three-level enhancement applied to that case, the Second Circuit affirmed that the district court correctly concluded substantial additional resources were expended by the U.S. Marshals in tracking down Leung.[6]  *Id.* at 67-68.

Two deputy Marshals worked on the Leung investigation for three to four hours each business day for over a month. *Id.* at 65. They worked with the New York City Police Missing Persons Unit, the Law Department and the Cantor Fitzgerald Insurance Company to track and identify leads looking for Leung.  *Id.*  The Marshals Service interviewed Leung's family members, former employees, Cantor Fitzgerald Insurance Company employees, Leung's former landlords and neighbors and others.  *Id.*  They further obtained hundreds of documents including from United Airlines and the Bellagio Casino.  *Id.*

Teams of Marshals conducted surveillance on eight different days prior to Leung being located and arrested after a month of this sustained effort.  *Id.*  The Second Circuit was correct in affirming the district court when it concluded that Leung's conduct

---

[5] Leung pretended to be someone else in the ruse and there is no evidence to suggest the attorney was part of a conspiracy to obstruct.
[6] The "substantial government resources" expended in *Leung* were limited to an analysis of the efforts of the Marshals Service as the governmental entity, with no effort made to include all other agencies involved in the search for Leung as "government resources" as was done in Wheeler's PSR.

7

was different than a typical "bail jumping" case.  *Id.; see also United States v. Harrington*, 82 F.3d 83, 86-87 (5th Cir. 1996)(application of three-level enhancement for substantial interference need not be connected with the initial offense of investigation but may also be connected with a separate investigation of the obstruction of justice offense).

In the instant case, the initial search for Defendant was massive, with many people volunteering their time to assist.  There is no question that these good people were extraordinarily affected by Defendant's criminal scheme.  Yet the search for Wheeler lasted for only two and one-half days (May 31 and June 1) before Defendant was found hiding in her home on June 2, 2020.  The investigation was solved in two days and its criminal nature was suspected almost immediately by members of the National Park Service.[7]  The Court and the Probation Department suffered no financial loss.

The United States will honor the Plea Agreement as written and may not seek the additional three-level enhancement that the PSR includes.  Defendant's criminal conduct was criminal, placed people at unnecessary risk while they searched for her, and she did conspire to obstruct justice.  Simply put, it was a vile

---

[7] Law enforcement became immediately suspicious once they reached the base of the 80 foot cliff and did not locate a body, impact crater, or signs of a fall (broken branches, disturbed limbs etc.) combined with the knowledge that the missing person was due in federal court for a criminal sentencing, information that was provided by the United States Attorney's Office on the same day, that is, May 31, 2020.

criminal scheme that took advantage of the good will of volunteers and professionals trying to assist in the search, and the Court should punish it accordingly. Her scheme did not result in this narrow enhancement for the "substantial interference with the administration of justice" because this Court administered justice in the healthcare fraud case swiftly and without delay.

## **RESTITUTION AND VICTIMS**

The parties agreed in the Plea Agreement that Defendant may be subject to an order of restitution for victims of the offense. *See* ECF 41, 18 U.S.C. §§ 3663 and 3663A; PSR, ¶ 118. The Court has requested restitution names and amount "for each entity entitled thereto." ECF 65 p. 1. The parties do not believe that restitution applies in the instant case. PSR, ¶ 118.

The Victim and Witness Protection Act authorizes restitution only for losses tracible to the offense of conviction. 18 U.S.C. § 3663. Restitution is mandatory where a defendant is convicted of or for entering a Plea Agreement relating to charges of cases in which a victim has suffered a physical injury or pecuniary loss. 18 U.S.C. § 3663A(c)(1)(B). "Victim" is defined as a person directly and proximately harmed as a result of commissioning of an offense where restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy or pattern of criminal activity, any person directly harmed by the

9

defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. 18 U.S.C. § 3663A(a)(i)(A)(2).

There are two government entities who were "victims" of the conspiracy to obstruct justice: the United States Probation Department and the National Park Service.[8] Neither has suffered a loss that is traditionally recoverable under the loss calculation for a victim with the meaning of 18 U.S.C. §§ 3663 or 3663(A).[9]

In this case, no government entity has a "loss" that is recoverable under 18 U.S.C. §§ 3663 or 3663(A) because the actual pecuniary loss to both agencies is zero. While these agencies certainly expended monies searching for Wheeler, this money was salaried, reimbursed, and is not typically subject to restitution. *Id. See also* USSG §2B1.1, comment. (n.E) (Credits against Loss). There was no expenditure made to the volunteers by the National Park Service. A representative from the National Park Service will be available to confirm that no entities were paid for or have submitted bills concerning their role in searching for Wheeler.

The National Park Service created records of all expenses associated with the Wheeler search and criminal investigation. These were summarized in the PSR, totaling $27,523.94. PSR, ¶ 26.

---

[8] This Court could also be classified as a victim.
[9] The pending state charges include false reporting to the 911 center and could perhaps capture costs and expenses associated with locating Wheeler at the state and local level.

10

This figure includes a compiled list of all costs for each day of the search.  *See* Exhibit 1.  These records further identify all volunteer agencies who worked to locate Wheeler.  *See* Exhibit 2.  The National Park Service used an estimate for the time of each volunteer of ten dollars an hour to affix a cost of the rescue.  This sum is a record keeping device and is not based on actual monies expended by the National Park Service.  No volunteer was paid by the National Park Service any sum of money for the search efforts.

Both the West Virginia State Police and the Army National Guard provided air support for the search in the form of helicopters.[10]  Exhibit 2.  The National Guard affixed a cost of the use of the Lakota helicopter at $10,512 dollars ($2,628 per hour of operation for four hours of operation) and the West Virginia State Police helicopter (type and model unlisted) as $5,100 ($1,700 dollars an hour for three hours of operation).  *Id.*

Neither entity appears to be a "victim" within the meaning of the MVRA, though if these agencies submitted a bill to the National Park Service that was paid, then this sum might fit the restitution criteria.  To date, these government agencies have not submitted a bill to the National Park Service for their efforts.  Like the volunteers, the cost of the use of helicopters was fixed by the

---

[10] The National Guard was specifically called by the National Park Service, though the West Virginia State Police responded independently.

11

government agency itself and may not necessarily reflect the actual cost or expense of the use of the machines.[11]

Finally, there is a complete record of all the National Park Service personnel who were involved in the search. *See* Exhibit 3. These are salaried federal employees whose salaries were already paid to by the National Park Service and may not be sought as restitution—they would essentially be paid twice. The overtime worked was also paid by the government itself, though from a different funding source, that is, the National Park Service's Emergency Services Branch. *See* 54 U.S.C. § 103101.

Case law further cautions that paying government agencies in such a fashion is tantamount to a fine and is not properly included as restitution. *See United States v. Ubakanma*, 215 F.3d 421, 428-29 (4th Cir. 2000) ("An order that a defendant make restitution to the Government rather than to a victim improperly converts that purported restitution payment into a fine.").

If restitution were legally able to be awarded by this Court, the United States would limit its request to the sum of $17,897.44. This is the sum of money paid to National Park Service employees for overtime work, but only to those employees who worked on the search and rescue operation and not on the criminal investigation,

---

[11] These entities, that is, the National Guard and the West Virginia State Police could submit a bill to the National Park Service for the use of the helicopters. The National Park Service has traditionally paid such bills as submitted.

(*Se*e Exhibit 4, totaling $2,285.44), added to the use of the helicopters, (*See* Exhibit 2, totaling $15, 612.)  If paid, the National Park Service should remit the monies for the use of the helicopters to the West Virginia State Police and West Virginia Air National Guard.

Wheeler certainly inconvenienced many people and professional resources were deployed in the search.  This conduct was criminal, hence the federal grand jury indictment and her resulting guilty plea.  However, these resources expended do not appear to be recoverable in the focused way that the law requires for the recovery of loss to a victim.

        Respectfully submitted,

        MICHAEL B. STUART
        United States Attorney

By: s/Erik S. Goes
    ERIK S. GOES
    Assistant United States Attorney
    WV State Bar No. 6893
    300 Virginia Street, East
    Room 4000
    Charleston, West Virginia 25301
    Telephone: 304-345-2200
    Fax: 304-347-5104
    E-mail: erik.goes@usdoj.gov

CERTIFICATE OF SERVICE

It is hereby certified that service of the foregoing "UNITED STATES RESPONSE TO DEFENDANT'S OBJECTIONS AND RESTITUTION" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this the 11th day of January 2021, to:

>Roger L. Lambert
>Lambert Law Office, PLLC
>P.O. Box 588
>Hurricane, WV 25526
>rlambert@lambertlawwv.com

>s/Erik S. Goes
>ERIK S. GOES
>Assistant United States Attorney
>WV State Bar No. 6893
>300 Virginia Street, East
>Room 4000
>Charleston, West Virginia 25301
>Telephone: 304-345-2200
>Fax: 304-347-5104
>E-mail: erik.goes@usdoj.gov